(No. 5007.   May 22, 1928.)

W. R. BOYDEN, PAUL G. SAVIC, BEN H. SMITH, Appellants, v. UNITED MERCURY MINES COMPANY, a Corporation, Respondent.

[267 Pac. 830.]

Fisher & Coffin, Chas. F. Reddoch and G. G. Adams, for Appellants.

304

Hawley & Hawley, for Respondent.

GIVENS, J.—W. R. Boyden contracted with the United Mercury Mines Company, a corporation, to construct, set up and install on the Hermes mining claim, belonging to respondents, a mercury ore reduction plant of approximately forty tons' capacity per day of not less than ninety per cent efficiency for the sum of $40,000 payable as follows: $15,000 by issuing 50,000 shares of capital stock of respondent to be delivered sixty days after the reduction plant should be installed. $25,000 by fifty per cent of the net proceeds of the sale of the mercury so produced, or by the delivery of quicksilver equal to that amount.

The plant was to be removed from another near-by mining claim. Respondents had the option either of so removing it or of paying $2,000 therefor. It elected the former. The contract expressly provided that except for the costs of transporting the plant, "all expenses of installing said plant and placing it in condition to successfully operate and treat ore" should be borne by W. R. Boyden and that the plant should be "so erected and installed without any cost or charge of any kind or character" to the respondent. W. R. Boyden was also to protect the respondent from liens for labor, etc.

It was further provided that Ben H. Smith, one of the appellants, should have charge of the installation and remain as superintendent as long as desired by respondent or until the $25,000 had been paid, his salary of $300 monthly to start when the respondent should begin the reduction of the mercury ore. It was further provided that a five per cent royalty of the gross proceeds should be paid in addition to but not until the $40,000 above mentioned had been paid; two and one-half per cent to Ben H. Smith and two and one-half per cent to Boyden,—Boyden having the opportunity to take his percentage in quicksilver.

Respondent was to furnish ore for continuous operation for six months, twenty-five tons per day, to average not less than one-half of one per cent of mercury. It was further provided in the contract that Ben H. Smith was the sole and exclusive owner of the patented process and the respondent was given the sole right to have other machines of the same kind operated or constructed in Valley county, Idaho, the sole charge therefor to be the five per cent royalty indicated above.

For the moment, passing over the history of the transaction culminating in the present action, suffice it to say that on October 29, 1924, Boyden assigned to Paul G. Savic a one-half interest in the consideration accruing to and belonging to him under the contract above mentioned, and later, on October 30th of the same year, gave a full and undivided interest of all his rights in said contract to the said Savic.

On March 30, 1926, Savic assigned sixty-seven and one-half per cent of his interest in the contract to Ben H. Smith. The consideration of the assignment from Boyden to Savic, dated October 29, 1924, shown in the record, was that Boyden might be relieved of the necessity of looking after the completion of the contract with respondent and that Savic should assume such duties. The only consideration expressed in the assignment of October 30th was that "there may well come a time when such a restricted interest might prevent your carrying to a successful issue any plans you might have in view." The consideration evidently expressed in the assignment from Savic to Smith was a rather extended agreement providing for co-operation in the foreclosure of the lien claimed in the present action to secure the payment of the $40,000 and certain liens claimed by Ben H. Smith against Savic and the respondent, for wages, etc., claimed by Ben H. Smith, and certain other laborers and lien claimants, interested in another lien suit but not herein, otherwise than by such purported assignment. Certain divisions of the proceeds that might be realized on were provided for as between Smith, Savic and their attorney.

The above explanation accounts for the parties appellant in this action (plaintiffs below). The action herein is to recover the purchase price agreed upon in the contract and to impress a lien therefor on the Hermes mining claim and the plant thereon on the theory that though the purchase price was to be paid in other than money, on respondent's refusal to pay, it became a money obligation. Such position is one of the disputed points in the action. The other principal contentions are:

Appellant claims that respondent so delayed the transportation of the plant as to materially retard and handicap the installation and setting up of the plant. The contract provided that respondent was to indicate where on the mining claim the machinery was to be placed and set up. There is a dispute as to whether the respondent, through its officers, pointed out where the plant was to be located or whether the location was determined upon by appellant Smith. There is also a controversy as to whether sufficient ore, and of the quality required by the contract, was delivered by the respondent. There are further disputes over the furnishing of wood for the operation and the furnishing of timber for the erection of the mill building to house the plant.

Appellant sought to show that respondent interfered with the progress of the work and hampered and hindered appellants in the installation and erection of the plant. The trial court was justified in finding to the contrary.

The chief contention, however, going to the merits of the case, was whether the contract was complied with by the appellants, it being claimed by them that they erected a machine of the kind contracted for and capable of doing the work required, which respondent denied.

The principal mechanism involved in the plant was a retort some twenty feet long, four and one-half feet wide and three feet high, in which there were three iron tables, supported on iron rods, one inch by two inches, over which a chain with lugs attached was caused to travel by means of a cog-wheel mechanism. The mercury ore was inserted

into one end of this retort by a hopper after having been pulverized by a crusher and rollers above, dragged over the tables by means of the chains with their lugs, being at the same time subjected to sufficient heat to drive off the mercury as a gas volatilized by the heat. The gas was then condensed, producing mercury or quicksilver. The iron box was encased in fire-brick and concrete. The heat was applied by means of a fire underneath the receptacle, the volatilized mercury being drawn off from the interior of the box by means of manifold pipes. In addition to this retort and by the terms of the contract, appellant Boyden was to set up and install a boiler, engine, electric generator, rock-crusher and cornish rolls, the latter to be operated by the electricity so generated. The engine was operated at one time for about two days and a half when respondent cut wood. At another time the entire reduction plant was operated for a short time when some 600 pounds of ore were run through and some mercury extracted. The machinery was never otherwise operated. During the test run the concrete covering which had been placed around the retort cracked in places, allowing smoke and heat to escape.

Appellant took the position that the concrete which cracked was put in place by the respondent. Respondent denied this and there was evidence to the effect that the concrete which was put in by the respondent was torn out by appellant. In any event there was a long period of time when the appellant could have put in either proper concrete or other material if concrete was not correct to adequately retain and conserve the heat around the iron retort-box, and the evidence in this regard, while perhaps conflicting, was sufficient to justify the finding in this respect.

The plates or tables and the iron supports buckled and sagged to such an extent as to prevent the chains and lugs from passing freely along and stripped some of the lugs from the chains. After this one attempt at operation the equipment was in effect abandoned by appellants except for their avowed intention to put in place a sheet-iron hopper,

which was never delivered, the hopper used, being of wood encased in sheet iron, having burned.

There was some dispute as to the exact temperature necessary to properly extract the mercury. All agreed that it was not less than 350° C. and the respondent contended that for a complete ninety per cent breaking up of the ore and separation of the mercury therefrom and consequent volatilization, over 700° C. was necessary. In either event it is obvious that the retort would be subjected necessarily to considerable heat for a more or less continuous and protracted length of time if operated to the full extent of taking care of forty tons daily.

The framework of the building to house this mechanism was erected by M. B. Smith, one of respondent's employees. The building was never completed. There is a dispute as to whether it was erected under appellant Smith or by respondent and as to whose duty it was to erect it. Further, with regard to the placing of the machinery, respondent claims that appellant Smith picked out an old building as a proper place for the boiler and that respondent was willing that it be placed there but stated that it was too small. Appellant Smith claims that respondent selected this building. The claimed imperfections of the building consisted in there being too short a distance between the engine and the generator for the proper functioning of the drive belt, that there was no concrete floor and the boiler was set in such a way as to make firing difficult.

All men employed, except appellants Smith and Savic, were paid by respondent and their wages charged to the account of Boyden.

The account sheet between Boyden and respondent as kept by the respondent's bookkeeper and which, if disputed at all is not done so successfully, is shown by Plaintiff's Exhibit "T," a summary of which discloses that exclusive of what Boyden paid to the Baxter foundry of Boise, which manufactured the iron retort-box, Boyden paid respondent $3,716.60 for wages paid and board furnished by respond-

ent for Boyden's account and for stock issued to Boyden's purchasers.

Boyden had a side agreement with respondent's president that Boyden might sell stock in respondent company at various prices, some in advance of the market price, and thereby raise money with which to defray the expenses of erecting and installing the machinery in controversy. Under this agreement, when Boyden requested that stock be issued, it was, irrespective of whether he had at that time remitted the purchase price. Including the amount of stock so issued at the price agreed upon, and the expense of work, labor and supplies, respondent had advanced in stock, wages, labor, etc., $7,197.18, leaving a difference in the amount of $3,480.58. It does not appear that appellant Savic was considered as a laborer or as an employee, entitled to wages as such, his claim being for his percentage of the contract price. Appellant Smith does not claim wages in this suit, his claim being. based on his assigned share of sixty-seven and one-half per cent of the contract price. So far as this action is concerned, therefore, aside from the money paid Baxter, respondent has advanced all of the money used in installing the plant.

According to the testimony of Charles Baxter, a witness for both sides, there were bills rendered between July 17 and July 21, 1923, to the amount of $2,837.21, which were paid in full by appellant Smith. In 1924 material was delivered valued at $256.96, for which Boyden paid $123.48 and Savic $133.48. In 1925 $170.55 of material was ordered by Savic and paid for by him but never taken from Baxter's place.

The total amount ordered, paid for and delivered by Boyden, Savic or Smith amounts to $3,094.17, leaving Boyden debtor to respondent in the sum of $386.41. There is no evidence as to the cost or value of the boiler, engine, rock-crusher or cornish rolls.

The trial court found that the contract was not complied with and that appellants were not entitled to recover anything. Appellants urge that the contract was substantially

performed and that they are entitled to at least the difference between the contract price and what it would cost to put the plant into first-class condition. Evidence was introduced over respondent's objection showing what such costs would be. The respondent contended that the contract called for the furnishing of a complete and entire plant designed to perform a certain kind of service.

The amended complaint was drawn on the theory that the contract had been completely performed, and not on the common counts, and in this respect does not differ from the original.

There are cases which hold in line with a portion of appellants' contention that when a contract is substantially performed and defects are trifling, the contractor may recover the contract price, less the expense of remedying the deficiency. (*City of St. Charles v. Stookey,* 154 Fed. 772; *Coffin v. Black,* 67 Ark. 219, 54 S. W. 212; *Daly v. New Haven Co.,* 91 Conn. 280, 99 Atl. 853; *Aetna v. Kossuth County,* 79 Iowa, 40, 44 N. W. 215; *Wade v. Haycock,* 25 Pa. St. 382.)

Respondent cites a case which it contends supports the view that where a specific device is being manufactured and sold, and it is specified that the same will do certain things, that when it does not come up to such specifications there can be no recovery on the theory of substantial performance. (*Elgin v. Schoenberger,* 59 Ill. App. 384.)

It is clear from a reading of the contract and the entire testimony in the case that the situation here falls in the latter division and not in the former.

Under the evidence the trial court was justified in finding such a lack of performance on the part of appellants as to deprive them of the right of recovery. (*Standard Roller Bearing Co. v. Hub Machine Co.,* 61 Pa. Sup. Ct. 14; *Bowser v. Kilgore,* 100 Ark. 17, 139 S. W. 541; *Marbury Lumber Co. v. Stearns Mfg. Co.* (Ky.), 107 S. W. 200; *Howard v. Albright,* 129 App. Div. 763, 114 N. Y. Supp. 194; *Logan v. Consolidated Gas Co.,* 107 App. Div. 384, 95

N. Y. Supp. 163; *Gove v. Island City Milling Co.*, 16 Or. 93, 17 Pac. 740.)

While the boiler, the engine, the generator, the rock-crusher and the cornish rolls might all have substantially conformed to the contract, they were of no value unless the retort worked. What rights the appellants have to recover them or their value on *quantum valebat* we are not deciding.

Not having alleged a cause of action upon the common counts, no relief can be granted upon that theory. (*Enterprise Co. v. Neeley* (Tex. Civ. App.), 217 S. W. 1088; *Pitcher v. Christ Church*, 83 Conn. 308, 76 Atl. 272; *Scholz v. Schneck's Estate*, 174 Ind. 186, 91 N. E. 730; *Davidson v. Gaskill*, 32 Okl. 40, 121 Pac. 649, 38 L. R. A., N. S., 692.)

Since the essential appliance contracted for was not delivered, it is unnecessary to discuss or consider the other issues in the case.

The judgment is affirmed. Costs to respondent.

Wm. E. Lee, C. J., and Budge, Taylor and T. Bailey Lee, JJ., concur.